UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| YIMING WANG, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 16-cv-12581 |
| XINYI LIU, YUANLONG HUANG, ZHAONAN WANG, BLING ENTERTAINMENT, LLC, SHENGXI TINA TIAN and MT LAW, LLC, | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                    **November 21, 2019**

### I. Introduction

Plaintiff Yiming Wang ("Yiming") has filed this lawsuit against Defendants Xinyi Liu ("Liu"), Yuanlong Huang ("Huang"), Zhaonan Wang ("Wang"), Bling Entertainment, LLC ("Bling"), Shengxi Tina Tian ("Tian") and MT Law, LLC ("MT Law") (collectively, "Defendants"). Against some or all of the Defendants, he alleges breach of fiduciary duty (Count I), civil conspiracy (Count II), fraud (Count III), breach of contract (Count IV), breach of the covenant of good faith and fair dealing (Count V), violation of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (Count VI), violation of the Massachusetts Uniform Securities Act ("MUSA"), Mass. Gen. L. c. 110A, §101 (Count VII), demand for accounting (Count VIII), professional malpractice (Count IX), breach of contract (Count X) and unjust enrichment (Count XI). D. 16.

1

On March 29, 2017, Bling filed a petition for Chapter 7 bankruptcy, which remains pending. D. 22; D. 26 at 2 n.1; see In re Bling Entertainment, LLC, No. 17-11058 (Bankr. D. Mass.). In accordance with 11 U.S.C. § 362(a), claims against Bling in this suit were automatically stayed pending Bling's Chapter 7 bankruptcy proceedings. See D. 22. Yiming voluntarily dismissed Tian and MT Law from the lawsuit on May 30, 2019. D. 76. Defendants Liu, Huang and Wang (collectively, the "Bling Defendants") moved to dismiss all counts against them on April 14, 2017. D. 25. The Court granted the motion to dismiss as to Counts VI and VII and denied the motion as to the other claims.[1] D. 41. The Bling Defendants have now moved for summary judgment on the remaining claims against them—breach of fiduciary duty (Count I), civil conspiracy (Count II) and fraud (Count III). For the reasons stated below, the Court ALLOWS the Bling Defendants' motion for summary judgment, D. 78, as to Claims I and II and as to Claim III in its entirety against Defendants Liu and Huang and DENIES the motion as to Count III against Wang, but only to the extent that it relies upon statements about the $5 million in funding.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex

---

[1] Yiming had previously voluntarily dismissed Claim V against the Bling Defendants under Fed. R. Civ. P. 41. D. 29 at 2 n.1. At the motion hearing, Yiming's counsel acknowledged that Yiming is not pursuing Count VIII against the Bling Defendants, which sought an accounting.

v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, 556 F.3d 20, 25 (1st Cir. 2009).

## III.  Factual Background

The following facts are drawn from the Bling Defendants' statement of material facts, D. 80, Plaintiff's response to this statement of material facts, D. 83, the Bling Defendants' further response to same, D. 89, and other supporting documents and are undisputed unless otherwise noted.

### A.  The Parties

Yiming, a Chinese citizen residing in Florida, came to the United States in 2008 to attend college. D. 80 ¶ 1; D. 83 ¶ 1. Defendants Huang and Liu are married and Defendant Wang is Huang's cousin. D. 80 ¶¶ 12-13; D. 83 ¶¶ 12-13. Following graduation, Yiming was interested in obtaining legal permanent resident status in the United States for himself and his wife through the United States Customs and Immigration Services' ("USCIS") EB-5 Program. D. 80 ¶¶ 2-3; D. 83 ¶¶ 2-3. The EB-5 Program offers foreign nationals the opportunity to obtain conditional green cards when, among other things, they invest at least $1 million in an eligible business in the United States. D. 80 ¶ 4; D. 83 ¶ 4.

### B.  Yiming Considers Investing in Bling

Yiming learned through a friend that a project to build a high-end karaoke bar in Massachusetts could provide him with an investment opportunity to obtain a green card through the EB-5 Program. D. 80 ¶¶ 3, 10; D. 83 ¶¶ 3, 10. Yiming first contacted Wang, a minority

3

member in Bling, about the project in May 2014. D. 80 ¶¶ 8-9; D. 83 ¶¶ 8-9. Yiming flew to Massachusetts and met with Wang on May 21, 2014. D. 80 ¶¶ 11-12; D. 83 ¶¶ 11-12. Yiming and Wang met in a conference room in Huang's office. D. 80 ¶ 12; D. 83 ¶ 12. At the time of the meeting, Huang was neither a member nor manager of Bling, although Yiming alleges that Huang was acting as a *de facto* manager at the time. D. 80 ¶ 13, D. 83 ¶ 13. Huang did not participate in the meeting between Wang and Yiming. D. 80 ¶ 14; D. 83 ¶ 14. Yiming alleges that Wang had a business plan for Bling with him at the meeting, but that he did not allow Yiming to review it and told Yiming that he could see the business plan only after investing in Bling. D. 80 ¶¶ 16-17; D. 83 ¶¶ 16-17. Yiming claims that Wang showed him slides about Bling, but that he could not recall the exact terms of financial projections in those slides. D. 80 ¶¶ 18-23; D. 83 ¶¶ 18-23. Yiming alleges that Wang told him during the meeting that Bling had already received $5 million in investments, including $1 million each from two other EB-5 investors. D. 80 ¶ 25; D. 83 ¶ 25. Yiming also alleges that Wang told him Bling was a "no risk" investment and that the karaoke bar would open in December 2014. D. 80 ¶¶ 26-27; D. 83 ¶¶ 26-27. Wang informed Yiming that attorney Tian of MT Law was representing the other two EB-5 investors. D. 80 ¶ 28; D. 83 ¶ 28.

After leaving his meeting with Wang, Yiming was undecided about whether to invest in Bling. D. 80 ¶ 31; D. 83 ¶ 31. Yiming wanted to speak with Tian to confirm that MT Law was representing the other EB-5 investors and to confirm that an investment in Bling was a "good" investment. D. 80 ¶ 32; D. 83 ¶ 32. Yiming called Tian, who confirmed her representation of the other EB-5 investors and that each of them had already invested $1 million. D. 80 ¶ 34; D. 85 ¶ 34. Although not disputing that $1 million was deposited into Bling by each of the other two EB-5 investors, Yiming argues that their contributions were not equity investments, but were loans. D. 80 ¶¶ 36-37; D. 83 ¶¶ 36-37. It is undisputed, however, that each of the other two EB-

5 investors deposited $1 million with Bling and that neither have sought a return of their investment. D. 80 ¶ 37; D. 83 ¶ 37; D. 88 at 13, n.9. After Tian confirmed that the investment was "good," Yiming decided to invest. D. 80 ¶¶ 39-40; D. 83 ¶¶ 39-40.

### C. Yiming Invests in Bling

In June 2014, Yiming engaged the same attorney, Tian, as his immigration counsel. D. 80 ¶ 42; D. 83 ¶ 42. On or around June 30, 2014, Yiming executed a Subscription Agreement, an Escrow Agreement to invest in Bling. D. 80 ¶ 45; D. 83 ¶ 45. The Escrow Agreement included a provision that states, in relevant part:

> Subject to Section 7.5 of the Operating Agreement, the Company [Bling] agrees to return the Escrow Property US $1,000,000 . . . upon written notification that either of the Investors' I-526 Petition is denied by the USCIS . . . The return of the Subscription Price shall be governed by the terms and provisions of the Subscription Agreement and the Operating Agreement.

D. 80 ¶ 51; D. 83 ¶ 51. There are varying versions of the Operating Agreement and the parties dispute which version controls. D. 80 ¶¶ 45-46; D. 83 ¶¶ 45-46. The Bling Defendants argue that section 7.5 of the Operating Agreement signed by Yiming states:

> If an EB-5 Investor receives a Denial Notice [from USCIS], such an EB-5 Investor shall promptly send a copy of such Denial Notice to the Company [Bling]. Upon receipt of the Denial Notice, the Company shall have the option to purchase the entire Interest of such EB-5 Investor . . . the Company shall exercise such right by sending notice . . . to such EB-5 Investor that the Company intends to purchase such EB-5 Investor's Interest.

D. 80 ¶ 52 & Ex. C; D. 83 ¶ 52. Yiming argues that he did not sign the version of the Operating Agreement that includes the language cited above and that a prior version of the Operating Agreement, stating that "[u]pon receipt of the Denial Notice, the Company shall purchase the entire Interest of such EB-5 Investor . . . at a purchase price equal to such EB-5 Investor's Unreturned Capital Contribution, less an administration fee up to $10,000" controls. D. 83 ¶ 52. Yiming's

5

father wired him the $1 million he needed to invest and Yiming then invested in Bling on or around August 14, 2014.  D. 80 ¶ 48; D. 83 ¶ 48.

  **D.** **Yiming's EB-5 Petition**

  In September 2014, Tian filed Yiming's EB-5 petition.  D. 80 ¶ 53; D. 83 ¶ 53.  The supporting documentation attached to the petition included Bling's business plan, verification of funding sources, copies of the Subscription Agreement, Escrow Agreement and Operating Agreement, bank statements and construction and project contracts.  D. 80 ¶ 54; D. 83 ¶ 54.  The business plan that was included was dated June 2014 and stated that the projected overall cost of the project was $4.5 million, which would include funding from three EB-5 investors.  D. 80 ¶ 55; D. 83 ¶ 55.  Yiming alleges that the supporting documents, including the business plan, were not included with the petition when he signed the petition and attested to its accuracy.  D. 80 ¶¶ 57-58; D. 83 ¶¶ 57-58.  Yiming alleges that he did not see any of the supporting documents until he later requested them from Tian and MT Law in June 2016.  D. 80 ¶¶ 57-58, 66; D. 83 ¶¶ 57-58, 66.

  **E.** **Problems Arise with Bling's Investors**

  Approximately four months after Yiming invested, in January 2015, Wang informed him expected investments from two non-EB-5 investors had not come through.  D. 80 ¶ 67; D. 83 ¶ 67.  Yiming and the other members of Bling voted to remove one of these non-EB-5 investors, Yuefe He, as manager of Bling and to reduce the ownership interests of both non-EB-5 investors who failed to contribute the total amounts they had committed to investing.  D. 80 ¶¶ 68-70; D. 83 ¶¶ 68-70.  Yiming also signed a settlement agreement with the two non-EB-5 investors after their counsel sent Bling a demand letter accusing Huang, Wang and Liu of corporate malfeasance.  D. 80 ¶ 71; D. 83 ¶ 71.

## F. USCIS Requests Additional Documents

In October 2015, USCIS requested additional documentation to support Yiming's EB-5 petition, including evidence of funding sources and an explanation regarding delays in the project's progress. D. 80 ¶ 72; D. 83 ¶ 72. Tian sent documents, including bank statements, evidence of funding sources, project contracts, and details of the delays with an updated project timetable, to USCIS. D. 80 ¶ 74; D. 83 ¶ 74. Tian sent the formal response to USCIS in January 2016. D. 80 ¶ 75; D. 83 ¶ 75. USCIS approved Yiming's EB-5 petition in February 2016. D. 80 ¶ 76; D. 83 ¶ 76.

## G. Bling's Financial Troubles

The Bling Defendants state that Bling ran out of funding in or around May 2015. D. 80 ¶ 77; D. 83 ¶ 77. Yiming alleges, however, that he was not told that the project had run out of money until a year later, in May or June 2016, and that Bling was representing to USCIS as late as January 2016 that the project was still funded. Id. Yiming contacted Tian in June 2016 asking for copies of all documents relating to his EB-5 petition, including the supporting documents. D. 80 ¶ 79; D. 83 ¶ 79. Yiming alleges that certain information included in the June 2014 business plan attached to his EB-5 petition differed from what he was told during his initial meeting with Wang. D. 80 ¶ 80; D. 83 ¶ 80. Yiming alleges that portions of the plan were "fraudulent" and that construction and project contracts were "fabricated" or "forged." D. 80 ¶¶ 81-83; D. 83 ¶¶ 81-83. Yiming contends that the Bling Defendants submitted these documents along with his EB-5 petition to ensure that Yiming's EB-5 petition was accepted so that Bling would not be obligated to return Yiming's $1 million investment. D. 80 ¶¶ 95, 104; D. 83 ¶¶ 95, 104. Bling filed for bankruptcy in 2017. See D. 24. Yiming has testified that he has voluntarily withdrawn his EB-5 petition. D. 83 ¶ 147; D. 89 ¶ 147.

**IV.    Procedural History**

Yiming instituted this action on December 22, 2016, D. 1, and filed an amended complaint on March 17, 2017. D. 16. The Bling Defendants subsequently moved to dismiss all claims against them on April 14, 2017. D. 25. The Court granted the motion to dismiss as to Counts VI and VII and denied the motion as to Counts I (breach of fiduciary duty), II (civil conspiracy), III (fraud) and VIII (accounting). D. 41. The Bling Defendants have now moved for summary judgment on these counts. D. 78. As noted above, Yiming is no longer pursuing Count VIII. The Court heard the parties on the pending motion as to the remaining three counts and took this matter under advisement. D. 92.

**V.    Discussion**

    **A.    <u>Breach of Fiduciary Duty (Count I)</u>**

Yiming alleges that the Bling Defendants—as "managers, controlling members, and fellow members of Bling"—owed a duty of utmost good faith and loyalty to him. D. 16 ¶ 70. Yiming alleges that they breached their fiduciary duty to him by (i) falsifying documents submitted to USCIS to ensure that Yiming's EB-5 application was accepted so that Bling was not obligated to return Yiming's $1 million investment; (ii) by engaging in self-dealing and mismanaging the project; and (iii) by embezzling money from Bling. D. 16 ¶ 71.

"A breach of fiduciary duty occurs where the fiduciary acts disloyally." <u>N. Am. Catholic Educ. Programming Found. v. Cardinale</u>, 567 F.3d 8, 17-18 (1st Cir. 2009) (quoting <u>Phillips Exeter Acad. v. Howard Phillips Fund, Inc.</u>, 196 F.3d 284, 291 (1st Cir. 1999)) (internal quotation marks omitted). This duty applies to shareholders of closely held corporations. <u>See, e.g.</u>, <u>Demoulas v. Demoulas Super Mkts.</u>, 424 Mass. 501, 528-29 (1997) (explaining that, in Massachusetts, close corporations' shareholders owe one another the duty of utmost good faith and loyalty) (citing <u>Donahue v. Rodd Electrotype Co. of New Eng.</u>, 367 Mass. 578, 592-594 (1975)); <u>Zimmerman v.</u>

8

Bogoff, 402 Mass. 650, 657 (1988). Here, the duty of "utmost good faith and loyalty" applies to majority and minority shareholders alike. See Zimmerman, 402 Mass. at 657-58 (citing Donahue, 367 Mass. at 593 n.17). The Bling Defendants do not contest that they owed a fiduciary duty to Yiming; rather, they argue that Yiming lacks standing to bring the alleged claims because these claims can only be brought as derivative claims on behalf of Bling and not as direct claims. D. 81 at 11-12. They also argue that Yiming's claim based on the Bling Defendants' alleged falsifying of documents is not actionable because it is based on the false premise that Bling was obligated to return Yiming's investment if USCIS denied his EB-5 petition. D. 81 at 12-13.

   1. Derivative and Direct Claims

Whether a claim is derivative or direct is determined by "the source of the claim of right itself." Blasberg v. Oxbow Power Corp., 934 F. Supp. 21, 26 (D. Mass. 1996) (quoting Branch v. Ernst & Young, No. 93-10024-RGS, 1995 WL 79194, at *4 (D. Mass. Dec. 22, 1995)) (internal quotation marks omitted). A claim, therefore, is derivative where "the right flows from the breach of a duty owed by the defendants to the corporation" such that "the harm to the investor flows through the corporation." Id. In contrast, "[i]f the right flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or creditor of the corporation, the suit is direct." Id. "In Massachusetts, the general rule is that where a right of recovery for a shareholder's wrongdoing belongs to a corporation, a claim for relief must be asserted in a derivative action and not as a direct action for breach of fiduciary duty." Orsi v. Sunshine Art Studios, 874 F. Supp. 471, 474 (D. Mass. 1995) (citing Bessette v. Bessette, 385 Mass. 806, 809-10 (1982)).

Yiming argues that his claims for breach of fiduciary duty are direct and not derivative because of the "redress" he seeks, namely, the return of his $1 million investment. D. 82 at 9-10.

9

Framing the damages sought as a return of one's investment does not convert a derivative claim to a direct claim. As explained in Blasberg, a claim is derivative if it is the corporation that "sustains an injury" as a result of the alleged misconduct. Blasberg, 934 F. Supp. at 26. As such, "if a plaintiff alleges mismanagement of funds, embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor." Id. Yiming's reliance on Int'l Bhd. of Elec. Workers Local No. 129 Benefit Fund v. Tucci, 476 Mass. 553, 558 (2017) is misplaced as the court there confirmed that the determining factor "depends on whether the harm [plaintiffs] claim to have suffered resulted from a breach of duty owed directly to them, or whether the harm claimed was derivative of a breach of duty owed to the corporation." Id.

Yiming argues that the allegations supporting his claim of breach of fiduciary duty should be considered "corporate malfeasance" and that, since the remedy he seeks is the return of his investment and not loss of value to the company, the claim is derivative. D. 82 at 10. As discussed, the characterization of the remedy sought is not the determining factor in whether a claim must be brought as a derivative claim, it is the nature of the duty owed and the actual resulting harm. Yiming's citation to Mooney v. Diversified Bus. Commns, No. 1684CV03726BLS2, 2018 WL 2293059, at *6 (Super. Ct. Mar. 5, 2018) is unavailing as the court, analyzing Delaware law, noted that claims arising out of a scheme to depress a company's value solely so that the company could reduce the amount owed to certain shareholders were properly brought as direct claims, not derivative claims, because the plaintiff stockholders suffered "individualized harm" that was not suffered by all of the company's stockholders. Id. By contrast, the allegations of self-dealing and embezzlement supporting Yiming's breach of fiduciary duty claim, would lead to a diminution in the value of Bling that would affect all shareholders and, therefore, would properly be redressed

10

through a derivative action. Since Bling is now in bankruptcy, such claims now belong to the bankruptcy estate. D. 79 at 12.

2. <u>There Has Been No Showing of a Breach of Fiduciary Duty Causing Damages to Yiming</u>

Even if the portion of Yiming's claim of breach of fiduciary duty that is based upon the allegation that the Bling Defendants submitted false documents to USCIS to avoid a contractual obligation to return his investment, can be asserted properly as a direct claim, it fails because Yiming has failed to show any injury from any such breach. To prevail on a breach of fiduciary duty claim, a plaintiff must show the existence of a fiduciary duty between the parties; breach of that duty; damages; and a causal relationship between the breach and damages. <u>Qestec, Inc. v. Krummenacker</u>, 367 F. Supp. 2d 89, 97 (D. Mass. 2005) (citing <u>Hanover Ins. Co. v. Sutton</u>, 46 Mass. App. Ct. 153 (1999)). Even assuming that a fiduciary duty existed between the parties, D. 41 at 13, this claim fails because there has been no showing that any alleged breach of that duty caused Yiming's damages. Yiming alleges that the Bling Defendants' breach of their fiduciary duty to him arising from their attempts to avoid their obligation to return Yiming's investment by allegedly falsifying documents to the USCIS. D. 16 ¶¶ 70-71. The Bling Defendants, however, had no obligation, fiduciary or otherwise, to return Yiming's investment upon denial of his EB-5 petition, D. 81 at 12-13, and, accordingly, Yiming's allegations do not support a breach of fiduciary duty claim against them.

Yiming's investment was governed by a Subscription Agreement, Operating Agreement and an Escrow Agreement. D. 80 ¶ 45; D. 83 ¶ 45. The parties agree that the Escrow Agreement signed by Yiming states that, upon denial of Yiming's EB-5 petition, "[s]ubject to Section 7.5 of the Operating Agreement, the Company agrees to return [Yiming's investment of] US $1,000,000." D. 80 ¶ 51; D. 83 ¶ 51. The Bling Defendants argue that section 7.5 of the Operating

11

Agreement signed by Yiming states that, upon denial of his EB-5 petition, "the Company shall have the option to purchase" Yiming's entire interest in Bling. D. 80 ¶ 52. Yiming argues that there is an alternate version of the Operating Agreement that obligates Bling to return his investment upon denial of his EB-5 petition because it states that "the Company shall purchase" his entire interest in Bling upon denial of his EB-5 petition and Yiming claims that there is a factual dispute as to which version of the agreement he signed. Id.; D. 82 at 12.

Yiming's argument is belied by documentary evidence indicating that he signed the Operating Agreement that includes the option language relied upon the Bling Defendants. It is undisputed that an email dated June 30, 2014 was sent from a legal assistant at MT Law to Yiming attaching the final versions of the documents governing his investment for him to execute. D. 89-3 at ¶ 2 (Affidavit of Min "Jessica" Ren); D. 89-4 (attachment sent to Yiming). The Operating Agreement attached to the email included the option language discussed above. D. 89-4 at 27. It is further undisputed that Yiming responded by attaching the agreements and signature pages that included his signature. D. 89-5 at 49. Yiming admitted during his deposition that the signature on the signature page that he returned to the legal assistant was his signature. D. 88 at 4; D. 83 ¶ 46. Accordingly, on this record, it is undisputed that Yiming executed the Operating Agreement that included the option language and, therefore, Bling did not have an obligation, but rather just the option, to return Yiming's investment upon denial of his EB-5 petition.

Yiming further argues that, even if the Operating Agreement terms are as the Bling Defendants contend and govern his investment, the integration clause of the Escrow Agreement precludes incorporation of the option language in section 7.5 of the Operating Agreement into the Escrow Agreement's provision pertaining to the return of Yiming's investment. D. 82 at 11-12. The integration clause states that "[e]xcept for the Subscription Agreement" the Escrow

Agreement "supersedes all prior agreements . . . and . . . constitutes a complete and exclusive statement of the terms of the agreement" between Bling and Yiming. D. 82 at 11. Yiming argues that, because the integration clause does not reference the Operating Agreement, other references to the Operating Agreement in the Escrow Agreement are inoperative. Id. Yiming's argument runs counter to settled principles of contract interpretation. "In interpreting contractual language, we consider the contract as a whole." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 785 (1st Cir. 2011) (quoting Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004)). "Not only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded." Id. (quoting Starr v. Fordham, 420 Mass. 178, 189 (1995)). The integration clause cannot be interpreted to invalidate the Escrow Agreement's specific reference to section 7.5 of the Operating Agreement as this would disregard a provision of the contract that the parties expressly included. P.R. Tel. Co. v. Sprintcom, Inc., 662 F.3d 74, 96 (1st Cir. 2011) (stating that "[i]t is a well-known precept for the interpretation of contracts that specific provisions in a contract trump the general provisions"); Clinical Tech. v. Covidien Sales, 192 F. Supp. 3d 223, 232 (D. Mass. 2016) (noting that "the Court must interpret [a contract] according to its plain terms, taking 'the words within the context of the contract as a whole, rather than in isolation'") (quoting Barclays Bank PLC v. Poynter, 710 F.3d 16, 21 (1st Cir. 2013)). The integration clause does not create any ambiguity in the contract language, which expressly incorporates Section 7.5 of the Operating Agreement into the Escrow Agreement.[2] Section 7.5 of the Operating Agreement, therefore, controls the return of Yiming's investment and renders it subject to the discretion of Bling.

---

[2] Yiming's reliance upon 4 MVR, LLC v. Warren W. Hill Constr. Co., No. 12-10674-DJC, 2016 WL 4775451, at *10-11 (D. Mass. Sept. 13, 2016) does not alter this conclusion. In that case, a party to a contract attempted to rely upon and enforce terms that were discussed in emails prior to execution of the contract even though those terms were not incorporated into the contract. Id. In that case, the court noted that an integration clause clearly prohibited the parties from

Since the Bling Defendants had no obligation, fiduciary, or otherwise to return his investment, their alleged failure to do so in the manner alleged by Yiming does not constitute a breach of fiduciary duty or damages arising from such an alleged breach. Accordingly, the Court grants summary judgment to the Bling Defendants on Count I.

### B. Fraud (Count III)

Yiming's claim of fraudulent inducement is based on allegations that, in his initial meeting with Wang to discuss Yiming's potential investment in Bling, Wang knowingly made false statements that (i) Bling had already received $5 million in funding, (ii) the investment was "no risk" and (iii) that the karaoke bar would be completed by December 2014. D. 82 at 15-19. Yiming also claims that a business plan allegedly prepared by the Bling Defendants included "false financial projections." D. 16 ¶ 34.

As previously noted, D. 41 at 9, a claim of fraud requires that "the defendant made a knowingly false statement concerning a material matter that was intended to, and did in fact, induce the plaintiff's reliance and, through that reliance, created an injury." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 357 (1st Cir. 2013) (citing Russell v. Cooley Dickinson Hosp., Inc., 437 Mass. 443, 458 (2002)). "Proof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge." Cummings v. HPG Int'l, Inc., 244 F.3d 16, 22 (1st Cir. 2001) (citing Snyder v. Sperry & Hutchinson Co., 368 Mass. 433, 444 (1975)). As to the plaintiff's reliance on defendant's statement, there must be a showing that such reliance was reasonable. Masingill, 449 Mass. at 540.

---

"relying upon statements and representations, either oral or written, that were made prior to the Contract and that are not reflected in the Contract." Id. at *11 (citing Ameranda Hess Corp. v. Garabedian, 416 Mass. 149, 155 (1993)). Here, the Operating Agreement was incorporated into the Escrow Agreement as it was expressly referenced in the Escrow Agreement multiple times, including in reference to any return of Yiming's investment. See D. 80-11 at 1, 3.

14

The Bling Defendants argue that Yiming's claim of fraud based upon the alleged statements made by Wang that the investment was "no risk" and that it would be completed by December 2014 are not actionable. The Court agrees that such statements here are not actionable. To be actionable, "[r]epresentations which provide the basis of fraud or misrepresentation claims must be statements of fact, meaning that they are susceptible of actual knowledge." Flaherty v. BayBank Merrimack Valley, N.A., 808 F. Supp. 55, 62 (D. Mass. 1992) (citing Zimmerman v. Kent, 31 Mass. App. Ct. 72, 79 (1991)). Accordingly, promises about certain future performance are actionable, see D. 82 at 17 and cases cited, but "optimistic predictions of future potential," Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co., Ltd., 53 F. Supp. 3d 279, 301 (D. Mass. 2014) (quoting Suna v. Bailey, 107 F.3d 64, 70-72 (1st Cir. 1997)) (internal quotation marks omitted), are not. The statement that the investment was "no risk" is among the statements that "are generally understood to be matters of opinion and if reliance is placed on them and they turn out otherwise the law does not afford a remedy." Von Schonau-Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 497-98 (2019) (quoting Kabatchnick v. Hanover-Elm Bldg. Corp., 328 Mass. 341, 344 (1952)); see Flaherty, 808 F. Supp. at 63 (noting that a "statement that an investment was 'no risk/no lose' [was] clearly puffing"). That is certainly true here where Yiming was making an investment in Bling to take advantage of the EB-5 program that requires an applicant to be making an investment of capital, D. 88 at 15; 8 C.F.R. § 204.6(j), and Yiming testified that he understood that the investment carried some risk and that he could lose money. D. 83 ¶ 7; D. 80-2 at 31.

The representation regarding the estimated opening date of December 2014 also is not actionable here because Yiming has made no showing that this statement, when made, was false or misleading. "[S]tatements of conditions to exist in the future, or of matters promissory in

15

nature" are generally not actionable. Cesso v. Todd, 92 Mass. App. Ct. 131, 139 (2017); Votolato v. Verizon New Eng., Inc., No. 16-cv-11663-DPW, 2018 WL 4696743, at *10 (D. Mass. Oct. 1, 2018). The undisputed record here as to the planned opening date is that it was delayed for reasons that occurred after Wang's representation to Yiming about such estimated date in May 2014. See D. 80-17 at 17-22. In fact, such explanation of the delay of any opening was made on Yiming's behalf to the USCIS in response to the agency's request for more information about his EB-5 application. Id. at 3. In its memorandum in support of the instant motion, the Bling Defendants asserted that "Yiming has not come forward with any evidence that the Defendants had reason to believe that the estimate regarding the opening date was wrong at the time it was made." D. 79 at 17. Having reviewed Yiming's opposition and the entirety of the record, that remains the case and, accordingly, this basis for Yiming's fraud claim fails.

The portion of Yiming's fraud claim that relies upon the alleged misrepresentation by Wang that Bling had already received $5 million in funding when Wang met with Yiming, D. 83 ¶ 25, however, stands on different footing. Wang disputes that he made this representation to Yiming and claims that he only told Yiming that Yiming needed to invest $1 million. D. 89 ¶ 124. The Bling Defendants further argue that, if Wang did make this representation, Yiming could not have reasonably relied on it because, prior to Yiming's investment, Bling disclosed financial information to MT Law for use in Yiming's EB-5 petition that indicated that Bling had not yet received all of the funding that had been committed. D. 88 at 13; D. 80-10 at 43-44; D. 80-13 at 5, 18. The Bling Defendants argue that this knowledge must be imputed to Yiming because MT Law was an agent of Yiming. Id. As Yiming's agent, disclosures by Bling to MT Law made prior to Yiming's investment in Bling would be imputed to Yiming. Langadinos v. Bd. of Trs. of Univ. of Mass., No. 12-11159-GAO, 2013 WL 5507042, at *9 (D. Mass. Sept. 30, 2013) (stating that

16

"[a]s [plaintiff's] agent, his counsel's knowledge is imputed to [plaintiff]"); Jones v. City of Bos., No. CIV. 03-12130-RGS, 2004 WL 1534206, at *2 (D. Mass. July 9, 2004), aff'd, 135 F. App'x 439 (1st Cir. 2005) (noting that "[plaintiff], as the principal, is held to constructive knowledge of the information acquired by his attorney as his agent"). It is undisputed that Yiming met with Wang on May 21, 2014 and that he engaged MT Law in early June 2014. D. 83 ¶¶ 12, 42. It is also undisputed that Yiming invested $1 million in Bling on or around August 14, 2014 and that MT Law filed Yiming's EB-5 petition in September 2014. D. 83 ¶¶ 48, 53. Although the Bling Defendants disclosed certain information with MT Law in June 2014 and, presumably sometime before the firm's September 2014 filing of EB-5 petition, D. 80-10; D. 80-13, it is not clear from the record whether such information was conveyed to Yiming prior to his decision to invest and/or whether, given that timing, it can be fairly imputed to Yiming. Moreover, the "disclosure of its funding sources," D. 88 at 13 & n.10 (citing D. 80-10 and D. 80-13) contained in the materials provided to MT Law is not a model of clarity about the amount of funds that the Bling Defendants had in hand at the time of the May 2014 meeting with Yiming when he contends Wang made the $5 million representation to him. See D. 80-13 at 5 (noting that enterprise "is capitalized by three (3) EB-5 investors, each of whom have invested/will invest $1,000,000; total cost of $4,500,000 will be sourced from 3 EB-investors and other sources), 17-18 (further discussing funding sources for $4,500,000); D. 80-10 at 30, 43-44 (same). Accordingly, there remains a disputed issue of fact about these matters. As a result, Yiming's claim of fraud against Wang based on his alleged representation that Bling had received $5 million in funding prior to Yiming's investment survives summary judgment. Since this claim is based upon a statement made only by Wang and not by Liu and Huang, and Yiming admits that he did not speak to Liu and Huang prior to his decision to

17

invest, D. 83 ¶ 41 (citing Yiming's deposition), it does not give rise to a claim for fraud against Liu and Huang.

Lastly, given the now developed record, the financial projections presented during the May 2014 also do not support Yiming's claim of fraudulent inducement. Yiming has admitted that he was not given the opportunity to review the business plan that contained the financial projections until after he invested in Bling, D. 83 ¶¶ 16-17, so it cannot be said that such projections induced his reliance. To the extent that Yiming is also relying upon financial projections that he attests were presented by Wang to him in slides, D. 83 ¶¶ 18-21, Yiming has not presented evidence of what those statements exactly were or whether they were false or misleading at the time that Wang made them. Id. (citing Yiming's deposition). Accordingly, based upon the undisputed record, this basis of his fraud claim also fails.

For all of these reasons, the Court ALLOWS the Bling Defendants' motion for summary judgment as to Count III, Yiming's fraud claim in its entirety against Liu and Huang and as to the fraud claim against Wang to the extent that it relied upon alleged misrepresentation about a "no-risk" investment or an estimated opening date. The Court DENIES the motion as to portion of the fraud claim against Wang regarding Bling's receipt of $5 million in funding.

### C. Civil Conspiracy (Count II)

Yiming claims that the Bling Defendants, among themselves and also with the participation of MT Law, conspired to commit fraud and breaches of their fiduciary duties to Yiming by making false statements to fraudulently induce Yiming to invest in Bling and by submitting false documentation to USCIS to avoid an obligation to return Yiming's investment. D. 16 ¶¶ 74-78; D. 82 at 19-20.

Massachusetts recognizes two theories of civil conspiracy. Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994). First, a plaintiff can prove civil conspiracy by showing that defendants "acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently." Id. (quoting Jurgens v. Abraham, 616 F. Supp. 1381, 1386 (D. Mass. 1985)) (internal quotation marks omitted). In such cases, "the wrong [i]s in the particular combination of the defendants rather than the tortious nature of the underlying conduct." Kam-O'Donoghue v. Tully, No. 16-cv-11054-MLW, 2019 WL 4273686, at *25 (D. Mass. Sept. 10, 2019) (quoting Kurker v. Hill, 44 Mass. App. Ct. 184, 187 (1998)).

Yiming's filings appear to allege a claim of conspiracy based on the theory of concerted action on the part of the alleged conspirators. "To prove a 'concerted action' conspiracy, a plaintiff must show that defendants either (1) acted in concert with or pursuant to a common design with the tortfeasor or (2) gave substantial assistance to the tortfeasor's conduct." Thomas v. Harrington, 909 F.3d 483, 490 (1st Cir. 2018) (internal quotation marks omitted) (citing Kyte v. Philip Morris Inc., 408 Mass. 162, 165 (1990)). A "concerted action" conspiracy is similar to the theory of common law joint liability in tort. Whitman & Co. v. Longview Partners (Guernsey) Ltd., No. 14-cv-12047-ADB, 2015 WL 4467064, at *12 (D. Mass. July 20, 2015). "Because it is vicarious liability, this type of civil conspiracy requires an underlying tort." Id. (citing Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009)).

Understanding the concerted action theory of conspiracy being pursued here, Yiming has not made a showing of such concerted efforts by the Bling Defendants, either in concert with each other or with others, namely MT Law. Even after discovery, the record is devoid of evidence as to Liu and Huang's actions in regarding to any alleged misrepresentations by Wang to Yiming, D. 88 at 18, or even to the USCIS regarding his EB-5 petition. D. 79 at 19-20. To extent that Yiming

19

contends that the Bling Defendants, either collectively or individually, conspired with MT Law, to defraud Yiming or mislead the USCIS with the purpose of defrauding Yiming or depriving him of his investment, there is no evidence from which a reasonable jury could draw that inference. Ramirez v. City of Worcester, 252 F. Supp. 3d 29, 33 (D. Mass. 2017) (noting that "[w]hile evidence of express agreement is not necessary to prove conspiracy, there must be sufficient circumstantial evidence for a reasonable jury to find the existence of a . . . conspiracy 'without speculation and conjecture'") (quoting Earle v. Benoit, 850 F.2d 836, 845 (1st Cir. 1988)). In fact, in his opposition to the motion for summary judgment as to the conspiracy count, Yiming makes no citation to the factual record here, despite the subheading that the record is "replete with evidence demonstrating a conspiracy." D. 82 at 19-20. Although there was collaboration with MT Law and the others in support of the EB-5 petition, there is no evidence to suggest a common design of fraud or substantially assisting such alleged fraud, accordingly, this claim fails as a matter of law.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS the Bling Defendants' motion for summary judgment, D. 78, as to Claims I and II as to all of the Bling Defendants and as to Claim III in its entirety against Defendants Liu and Huang and DENIES the motion as to Count III against Wang, but only as to the portion of the fraud claim that relies upon Wang's statements about Bling's receipt of $5 million in funding. Accordingly, only this portion of Count III against Wang remains for trial.

**So Ordered.**

/s/ Denise J. Casper  
United States District Judge